# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| | : |
| BERKS BEHAVIORAL HEALTH LLC | : |
| | : |
| Debtor | : BANKRUPTCY No.  10-10290 |
| | : |
| BERKS BEHAVIORAL HEALTH LLC | : |
| PLAINTIFF | : |
| vs. | : |
| | : |
| ST. JOSEPH REGIONAL HEALTH NETWORK | : |
| D/B/A ST. JOSEPH MEDICAL CENTER, ET AL | : ADV. No. 10-00163 |
| DEFENDANTS | : |
| | : |

# OPINION

BY:  STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

St. Joseph Regional Health Network, d/b/a St. Joseph Medical Center (St. Joe),

Catholic Health Initiatives (CHI) and Bornemann Health Corporation d/b/a Bornemann

Psychiatry Associates (Bornemann) seek to compel the production of certain

documents.  Plaintiff opposes the Motion.  Briefs and supplemental replies were

submitted.  Oral argument was heard on September 18, 2013.  The Court thereafter

took the matter under advisement.   For the reasons which follow, the Motion will be

granted with minor exceptions.

*Summary of Holding*

The Court will grant the Defendants' Motion to Compel Production of Documents. Within 20 days of the date of the entry of the order which follows this opinion, the Plaintiff shall produce documents responsive to the 6 document requests to which it objected on the basis of privilege, relevance, and/or overbreadth.  Only the four entries in the Plaintiffs' privilege log which the Court will discuss *infra* may the Plaintiff withhold on the basis of attorney work product.  Such otherwise privileged information may potentially be obtained after further discovery and an additional showing of substantial need.

*Background*

The Plaintiff (Debtor) was a mental health care provider.  Prior to bankruptcy, it entered into a Management Services Agreement (MSA) with Defendants St. Joe and Bornemann.  Under the MSA, the Plaintiff operated a mental health clinic and the Defendants provided administrative assistance and other necessary services to that business.  *See* Defendants' Brief, Ex. A, First Amended Complaint.  As further inducement to run the clinic, the Defendants are alleged to have promised the Plaintiff that they would assist in the expansion of the practice.  The Complaint alleges that because the Defendants failed to perform under the MSA, the business failed and the intended expansion never occurred.  Indeed, says the Plaintiff, so egregious were the Defendants' alleged derelictions that not only was expansion impossible, but a bankruptcy filing was the sole option.  *Id.* ¶ 81.  In that proceeding, the Debtor has commenced this litigation and demanded direct damages of $2 million and

2

consequential damages of $25 million.  The latter figure is alleged to represent lost

profits due to inability to expand as anticipated.

After the close of the pleadings, the parties commenced discovery.  Defendants

assert that they have learned in discovery that Plaintiff never intended to expand the

business.  Defendants' Brief, 10.  Instead, they maintain, the Plaintiff intended to sell the

business at an auction at which the Debtor's principal's son would be the high bidder.

*Id.* 11.[1] This, Defendants say, would disprove any claim for consequential damages.

*Discovery Dispute*

Defendants say that they learned of these facts through an indirect source.

Through subpoenas of third parties, they say, they obtained information tending to belie

any plans to expand.  Defendants' Brief, 4-5.  Although Defendants had earlier

requested the same information, the Plaintiffs objected on the bases of privilege,

relevance and overbreadth.  *Id.* 6.  It would be from the responses of George

Chopivsky, Jr., the Debtor's principal, as well as his son, George Chopivsky, III, that the

Defendants would learn of this revelation.   *Id.* 7.  That, in turn, caused the Defendants to

renew the requests upon the Plaintiff for corroboration.  When Plaintiff continued to

refuse, this motion to compel was filed.

*Specific Discovery*
*Requests*

Six specific requests for documents are at issue.  The requests were made in the

Defendants' Second and Third requests for Production of Documents.  Four of the

---

[1] As it turned out, the business was sold pursuant to a confirmed Chapter 11 plan albeit
to a non-insider.

3

requests were made in Second Request:

>21. All documents reviewed by BBH when making its
>determination to file the Chapter 11 Petition.
>
>22. All communications relating to BBH's decision to file the
>Chapter 11 Petition.
>…
>28.  All documents and correspondence indicating action
>BBH took, or intended to take, to expand its services to
>include a separate in patient adolescent behavioral health
>unit, as set forth in paragraph 82 of the Amended Complaint.
>
>29. All documents and correspondence indicating actions
>BBH took, or intended to take, to build the expanded
>Inpatient Facility adjacent to St. Joseph's suburban Berks
>County campus, as set forth in paragraph 83 of the
>Amended Complaint, including, but not limited to, the
>"expansion plans."

*See* Defendants' Brief, Ex.D, ¶¶ 21-22, 28-29.  BBH has objected to these requests on

the basis of overbroadness, relevance, and privilege.  *See id.* Ex. F, G.

The final two requests were made in the Third Request:

>33. All documents BBH relied on when calculating its alleged
>loss of $5 million that BBH purportedly suffered as a
>consequence of its alleged inability to operate an inpatient
>adolescent behavioral health unit as set forth in paragraph
>82 of the Amended Complaint, including, without limitation,
>all profit projections and all documents relied on in creating
>those projections.
>
>34. All documents BBH relied on when calculating its alleged
>loss of $20 million that BBH purportedly suffered as a
>consequence of its alleged inability to build an expanded
>Inpatient Facility as set forth in paragraph 83 of the
>Amended Complaint, including, without limitation, all profit
>projections and all documents relied on in creating those
>projections.

*See id.* Ex.E, ¶ 33-34.  These requests were objected to on the basis of overbroadness

and irrelevance.  *See id.* Ex. K.  Also made were the points that the damage

calculations have either been previously produced; that they will be produced; or that

they will be disclosed in expert witness discovery.  *See* Plaintiff's Response, 10 and

Supplemental Response, 8-9.

*Discovery Standard*

The general parameters for discovery are found in Rule 26:

> Scope in General. Unless otherwise limited by court order,
> the scope of discovery is as follows: Parties may obtain
> discovery regarding any *nonprivileged* matter that is *relevant*
> to any party's claim or defense-- including the existence,
> description, nature, custody, condition, and location of any
> documents or other tangible things and the identity and
> location of persons who know of any discoverable matter.
> For good cause, the court may order discovery of any matter
> relevant to the subject matter involved in the action.
> Relevant information need not be admissible at the trial if the
> discovery appears *reasonably calculated to lead to the
> discovery of admissible evidence.* All discovery is subject to
> the *limitations imposed by Rule 26(b)(2)(C).*

F.R.C.P. 26(b)(1) made applicable by B.R. 7026 (emphasis added).  *See Barnes*

*Foundation v. Township of Lower Merion*, 1997 WL 256043, at *1 (E.D.Pa. May 9,

1997) (observing that Rule 26(b)(1) establishes the general scope of discovery).

"Questions concerning the scope of discovery are among those matters which should

be almost exclusively committed to the sound discretion of the district court." *Id.* citing

*Wisniewski v. Johns–Manville Corp*, 812 F.2d 81, 90 (3d Cir.1987); *Howze v. Jones &*

*Laughlin Steel Corp.*, 750 F.2d 1208, 1213 (3d Cir.1984); *Great West Life Assurance*

*Co. v. Levithan*, 152 F.R.D. 494, 496. (E.D.Pa 1994).

*Privilege*

A claim of privilege is raised as to the second request for production of documents. Because a valid privilege will apply regardless of relevance, it must be dealt with first. The applicable rule of procedure prescribes how the privilege may be raised:

> **(A)** *Information Withheld.* When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> **(i)** expressly make the claim; and
>
> **(ii)** describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

F.R.C.P. 26(b)(5) A privilege log is necessary to enable the opposing party (and the Court) to test the propriety of that assertion. *Velocity Intern., Inc. v. Celerity Healthcare Solutions, Inc.*, 2010 WL 2196423, at *4 (W.D.Pa. June 1, 2010). Plaintiff submitted a privilege log on March 31, 2013. The rule reflects that the burden to establish a claim of privilege is on the party asserting the privilege. *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir.2012).

Defendants argue that Plaintiff's failure provide a privilege log earlier than 15 months after first making the objection constitutes a waiver of the privilege. Plaintiff responds that it withheld the documents on grounds other than just privilege. In other words, says Plaintiff, no privilege log is requires for documents not discoverable for other reasons. For its part, the Court considers waiver to be too harsh a punishment.

6

The Plaintiff having since produced a privilege log, the Court dismisses the claim of

waiver.

*Attorney Client*

The first of the two types of privilege invoked is the attorney-client privilege.

That privilege protects from disclosure confidential communications made between

attorneys and clients for the purpose of obtaining or providing legal assistance to the

client.  *In re Teleglobe Commc'ns Corp.,* 493 F.3d 345, 359 (3d Cir.2007)  Although

such communications may be both relevant and highly probative of the truth, they are

shielded from production in order "to encourage full and frank communication between

attorneys and their clients and thereby promote broader public interests in the

observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S.

383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

*Elements*

In order for the attorney-client privilege to attach to a communication, "it must be

'(1) a communication (2) made between privileged persons (3) in confidence (4) for the

purpose of obtaining or providing legal assistance for the client.' " *In re Teleglobe,*

*supra,* 493 F.3d at 359 (quoting *Restatement (Third) of the Law Governing Lawyers* §

68 (2000)).  "If persons other than the client, its attorney, or their agents are present, the

communication is not made in confidence, and the privilege does not attach." *Id.* at 361.

The privilege "exists to protect not only the giving of professional advice to those who

can act on it but also the giving of information to the lawyer to enable him to give sound

and informed advice." *Upjohn, supra,* 449 U.S. at 390. To the extent that the record is

7

ambiguous as to the elements which are necessary to establish the claim of privilege,

'the burden of proving that the attorney-client privilege applies is placed upon the party

asserting the privilege.' " *In re Grand Jury Empanelled February 14, 1978,* 603 F.2d

469, 474 (3d Cir.1979) (quoting *United States v. Landof,* 591 F.2d 36, 38 (9th

Cir.1978)).

*Agent*

Defendants demand production of communications made in the presence of Mr.

Chopivsky III.  To reiterate, he is neither a party to this litigation nor a principal of the

Debtor; he is the son of George Chopivsky, Jr., the Debtor's principal.  Disclosing a

communication to a third party unquestionably waives the privilege.  *Teleglobe,* 493

F.3d at 361. Notwithstanding, the Plaintiff insists that Mr. Chopivsky, III's presence

during certain discussions does not waive the privilege. The attorney client privilege

survives, says Plaintiff, because he is the agent of the Debtor. A person is an agent of

the client for purposes of this privilege "if the person's participation is reasonably

necessary to facilitate the client's communication with a lawyer or another privileged

person and if the client reasonably believes that the person will hold the communication

in confidence."  *Restatement, supra*, § 70, comment f; *see also Teleglobe,* 493 F.3d at

359 (citing *Restatement* §70).

To demonstrate that Mr. Chopivsky III was the Debtor's agent, the Plaintiff offers

the affidavit of his father, Mr. Chopivksy, Jr., as well as that of Mr. Chopivsky, III.  The

affidavit of Mr. Chopivksy Jr., the Debtor's principal, is dated July 12, 2013.  It explains

that when he was travelling and could not attend meetings, Mr. Chopvisky Jr. would rely

8

on his son to handle business and legal matters relating to the Debtor.  *See* Plaintiff's

Supp. Response, Chopivsky, Jr. Affidavit ¶¶ 8-11.  The affidavit of his son is also dated

July 12, 2013 and says essentially the same things.  It talks of his working closely with

his father, with his father's request that he participate generally in communications with

bankruptcy counsel, and to his reviewing and editing of  draft documents prepared by

the Debtor's counsel.  *See id.*  Chopivsky III Affidavit, ¶¶ 4-8.  Once Mr. Chopivsky III

decided to bid on the Debtor's assets, he obtained separate counsel.  *Id.* ¶ 10  Both

father and son explain that the son's participation was necessary to the successful

prosecution of the bankruptcy case.

This explanation, however, is sharply at odds with Mr. Chopivsky Jr.'s testimony

in his September 2012 deposition.  At that time, he testified that his son did not work for

the Debtor:

> Q.  Did he work for BBH at all?
>
> A.  No, he didn't.

*See* Defendants' Supp. Brief, Ex. B, p. 230.  With regard to the Debtor's disputes with

the Defendants, Mr. Chopivsky Jr. was at that time unclear as to the extent of his son's

involvement.

> Q.  So your son was involved in this?
>
> A.  Not really. I mean he may have been involved at that
>      stage.  Maybe I asked him to write [the email discussed
>      below] but essentially he was not involved.

*Id.* 229.  He was equally unsure of why his son wrote an email which proposes to set up

a meeting with other officers of the debtor to discuss a strategy regarding a meeting

9

with the Defendants:

Q.      Mr. Chopivsky, I'm showing you a document we've
        marked as Chopivsky Number 25.  It's BBH101982.
        Email at the bottom, there's an e-mail at the bottom
        and then there's an e-mail at the top from you and this
        actually says – well, I don't know if this is from you.  It
        says chopivsky@yahoo.com.  Is that you?

A.      It is not me.

Q.      Who is it?

A.      It's my son.
…
Q.       I'm sorry, did you say you asked him to write this e-
        mail?

A.       I don't know.  I'm speculating that maybe I did.  I don't
        know what the providence [*sic*] is of the e-mail.

Q..     Your son was included on the e-mail below, right?

A.      Correct.

Q.      Do you know why he was included on that e-mail?

A.      I don't know.
…

Q.      He says in the e-mail: Garry, I understand that you
        and Al have a meeting with St. Joe's management
        next Friday, the 21st.  I don't know if there is a specific
        agenda but we would like to have a conference call at
        the beginning of the week to review the issues and
        make sure that we have a good grasp of the details
        and come up with a strategy as to how we want to
        approach the.  So when he says "we" there, is he
        referring to you and him?

A.      Probably.

*Id.* 228-231.  The same response is given when asked why his son was given a copy of

the Debtor's operating budget:

> Q.    And the attachment was the Berks Operating Budget,
>        4th quarter final; is that right?
>
> A.    That's what it's labeled, yes.
>
> Q.    Do you know why your son is copied on this?
>
> A.    No, other than for his information.
>
> Q.    He's not an owner, right?
>
> A.    Correct.

Id. 239.  Equally, his answer to the question of whether he hoped his son would be the

winning bidder demonstrates an affected disinterestedness; he demurred as to the

prospect of his son owning the Debtor:

> Q.    Did you son bid?
>
> A.    I believe he did.
>
> Q.    What did he bid?
>
> A.    I don't remember.  He dropped out very early.
>
> Q.    Was your intent to go back in business with your son
>        with Capital Healthcare?
>
> A.    No, not necessarily.  If he could buy it and operate it,
>        that would be great.
>
> Q.    Did you ever discuss that with your son?
>
> A.    Doing it with him?
>
> Q.    Yes.
>
> A.    No.

11

Q.    I'm sorry?

A.    Did I discuss buying the hospital with him?

Q.    Yes.

A.    No.

Q.    Did you – what discussions did you have with him
        about his making a bid for the assets of BBH?

A.    Only that I thought that not being able to predict what
        the price might be, this might be a good buy for him?

*Id.* 274-275

The general evasiveness of Mr. Chopivsky, Jr.'s original deposition testimony

cannot be reconciled with the certainty of his later attestations.  Over a ten month

period, Chopivksy Jr.'s memory went from not remembering to what extent his son was

involved in the Debtor's operation (or why) to complete clarity on that question.  He

testified to specifically requesting that his son be included in correspondence relating to

the Debtor.  He regularly included his son as an agent of the Debtor on correspondence

with bankruptcy counsel.  *See* Chopivsky Jr. Affidavit ¶¶ 10-11.  This clarity comes at a

time when it is in the Plaintiff's best interest to remember events just this way.  The

dichotomy is so striking as to be distressingly suggestive of intentional falsehood.  The

Court will not draw that conclusion, however, the Court finds this so patently incredible

and abusive as to justify the imposition of judicial estoppel.  Judicial estoppel is an

equitable doctrine that entails "the intrinsic ability of courts to dismiss an offending

litigant's complaint without considering the merits of the underlying claims when such

dismissal is necessary to prevent a litigant from playing fast and loose with the courts."

12

*Singer Mgmt Consultants, Inc. v. Milgram,* 650 F.3d 223, 238 (3d Cir. 2011) "Though

there is no rigid test for judicial estoppel, three factors inform a federal court's decision

whether to apply it: there must be (1) 'irreconcilably inconsistent positions;' (2) 'adopted

... in bad faith;' and (3) 'a showing that ... estoppel ... address[es] the harm and ... no

lesser sanction [is] sufficient.' " *G–I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247,

262 (3d Cir.2009) (quoting *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n. 5 (3d

Cir.2008)). It does not strike the Court as a coincidence that Chopivsky Jr.

recharacterized his son's role in the company when the Defendants asked for discovery

of information which included the son.  This change appears to have been motivated by

a desire to withhold adverse information and not, as represented, to preserve a

privilege.  That reflects bad faith on the Plaintiff's part.  In the Court's view, the

appropriate way to address this misconduct is to estop Mr. Chopivsky Jr. from arguing

that his son is an agent of the Debtor for purposes of maintaining the privilege.

*The Privilege*
*Among Clients*

Alternatively, the Debtor argues that the privilege yet applies because both

Chopivsky III and the Debtor share a common interest in withholding what was

discussed.  As a general proposition, the attorney-client privilege extends to matters of

common interest between two or more persons represented by the same counsel:

> If two or more persons are jointly represented by the same
> lawyer in a matter, a communication of either co-client that
> otherwise qualifies as privileged under §§ 68- 72 and relates
> to matters of common interest is privileged

*Restatement (Third) Governing Lawyers* § 75(1).  The privilege also extends to persons

represented by different counsel as to matters of common interest in the litigation:

> If two or more clients with a common interest in a litigated or
> nonlitigated matter are represented by separate lawyers and
> they agree to exchange information concerning the matter, a
> communication of any such client that otherwise qualifies as
> privileged under §§ 68- 72 that relates to the matter is
> privileged as against third persons.

*Restatement, supra*, § 76(1);  see generally *Teleglobe*, *supra*, 493 F.3d at 362-366.

The Court makes this observation with regard to both joint and separate representation

because a different evidentiary standard applies depending on whether  Mr. Chopivsky

III was a co-client of the Debtor or whether he had obtained separate counsel at the

time the withheld communications were made.  As the Third Circuit explained:

> [W]hile the Restatement (confusingly) uses the term
> "common interest" to describe the congruence of the parties'
> interests in both co-client and community-of-interest
> situations, the concepts are not the same. *Compare*
> Restatement (Third) of the Law Governing Lawyers § 75(1)
> ("If two or more persons are jointly represented by the same
> lawyer in a matter, a communication of either co-client that ...
> relates to matters of *common interest* is privileged as against
> third persons."), *with id.* § 76(1) ("If two or more clients with a
> *common interest* in a litigated or nonlitigated matter are
> represented by separate lawyers and they agree to
> exchange information concerning the matter, a
> communication of any such client ... is privileged as against
> third persons."); *cf. id.* § 76 cmt. e & Reporter's Note cmt. b
> (explaining that co-client and community-of-interest
> situations differ). In particular, because *co-clients* agree to
> share all information related to the matter of common
> interest with each other and to employ the same attorney,
> *their legal interests must be identical* (or nearly so) in order
> that an attorney can represent them all with the candor,
> vigor, and loyalty that our ethics require. *See Ogden,* 202
> F.3d at 461. In the *community-of-interest* context, on the
> other hand, because the clients have separate attorneys,

> courts can afford *to relax the degree to which clients'*
> *interests must converge* without worrying that their attorneys'
> ability to represent them zealously and single-mindedly will
> suffer.

*Teleglobe, supra*, 493 F.3d at 365-366 (emphasis added).

This analysis must be considered because the evidence as to when Mr. Chopivsky III obtained his own counsel is unclear.  For example, Mr. Chopivksy Jr.'s affidavit states that his son's decision to retain separate counsel was made "sometime during the bankruptcy" after his son decided to bid on the Debtor.  *See* Plaintiff's Supp. Response, Ex. A. Affidavit of George Chopivsky, Jr., ¶ 14.  His son's affidavit corroborates this. *See id.* Affidavit of George Chopivsky III ¶ 10.  Given that the auction occurred in August 2010, that means that he obtained his own counsel after the filing (December 24, 2009) but before August 2010.  This 7 month period corresponds roughly with the time period of the privileged communications on the log (February 2010 to September 2010).  So the Court cannot tell exactly when Mr. Chopivsky III had his own counsel and when he was jointly represented.  In order to cut through this confusion, the Court will first analyze the record for commonality under the *lesser standard* applicable to *separate representation*.  If the Plaintiff cannot meet that laxer standard, then this claim of privilege fails.

As to what similarity and types of interests qualify as 'common' for purposes of this privilege, the Third Circuit observes that the *Restatement* takes a "flexible approach.  *Teleglobe*, 493 F.3d at 365.  The Restatement provides that "the common interest ... may be either legal, factual, or strategic in character.  The interests of the separately represented clients need not be entirely congruent." *Id.* quoting *Restatement*

15

§ 76 cmt. e.  What the Debtor points to as common interest as between it and Mr.

Chopivsky III are the latter's willingness to assume the Defendants' lease.  That,

however, has nothing to do with the Debtor's claim against the Defendants for breach of

contract.  The ultimate result of that litigation may affect what is owed to St Joe for rent

but that does not concern Mr. Chopivsky III.  At auction, the winning bidder took all

assets free and clear of liens with debts to attach to the proceeds.  His gratuitous

intention to assume the lease might also be motivated by a favorable rate per square

foot (i.e., below market).  The purported assumption of the St. Joe lease by Chopivsky

III is not probative.

Neither is the alleged willingness of the Defendant landlord to subordinate its

claim.  That decision may have been motivated by a desire to obtain creditor support for

the sale to the winning bidder. By relegating its claim, the Defendant landlord may have

increased the distribution to those creditors whose claims would be otherwise diluted. [2]

The fact that the Defendants would not subordinate their rent claim if Mr. Chopivsky III

won the auction might be explained by his insider status.  *See* Daniel J. Carragher,

*Sales to Insiders: Are they Entirely Fair?,* 29 Am. Bankr. Inst. J. 52 (November 2010)

(noting that §363 sales to insiders are subjected to higher scrutiny).  What Defendants

did (or did not do) at the auction simply has nothing to do with the Plaintiff's causes of

action.

What the Court *does* find quite probative on this question is the inherent conflict

between the Debtor's primary duty and Mr. Chopivsky III's purported interest.  Mr.

---

[2] Indeed, the plan paid creditors 100% and for that reason the classes were not impaired and, therefore, presumed to accept the plan.

16

Chopivsky III was never an officer or owner of the Debtor.[3]  He was explained to be his

father's advisor in business matters, including bankruptcy.  The Court has already

estopped the Plaintiff from claiming him as an agent.[4]  If he is neither officer, agent or

equity owner, then his status is unclear.  That status would clarify itself once he decided

to bid at the auction; thereafter, Mr. Chopivsky III's interest would presumably run

adverse to the Debtor.  This is due to the fact that the Debtor is bound to accept the

highest bid possible while no bidder (i.e., Mr. Chopivsky, III) would be expected to bid

against himself.  It is at that point that the interests of the Debtor and Mr. Chopivsky III

are irreconcilable.  As to exactly what point in time that was, the Plaintiff is, once again,

vague.  It is explained that sometime between the bankruptcy filing (December 24,

2009) and the auction (August 2010), Mr. Chopivsky III decided to make a bid.  *See*

Chopivsky, Jr. Affidavit, ¶ 14; Chopivsky, III Affidavit, ¶ 10.  This is a point on which the

Plaintiff bears the burden of proof yet it can be no more specific than to point to a 7

month period of time.  The Court considers this self-serving: some recollection or

memorialization of when that decision was made should almost certainly exist.  This

dissembling is the same type of conduct which prompts the Court to estop the Debtor

from claiming that Mr. Chopivsky III was its agent for privilege purposes.  Accordingly,

the Debtor is not entitled to the benefit of the doubt on this question.  The Court finds,

therefore, that the Plaintiff has not demonstrated that it and Mr. Chopivsky III shared a

---

[3] See Statement of Financial Affairs ¶21.
[4] He was not appointed by the Court and his insider status would preclude any claim of
disinterestedness anyway.  *See* 11 U.S.C. § 327(a) (requiring as condition of employment
disinterestedness); *see also* 11 U.S.C. § 101(14) (precluding insider from disinterestedness
status).

common interest such as would extend the privilege to communications involving him.

*Work Product*

If the information is not protected by the circumstances under which it was

communicated, it might nonetheless warrant privilege from the circumstances under

which it was created.  What is referred to as attorney work-product is likewise protected.

*See Hickman v. Taylor*, 329 U.S. 495, 505, 67 S.Ct. 385, 91 L.Ed. 451 (1947)

(recognizing the work-product doctrine as a product of federal common law).  It has

since been codified in the federal rules of civil procedure:

> Ordinarily, a party may not discover documents and tangible
> things that are prepared in anticipation of litigation or for trial
> by or for another party or its representative (including the
> other party's attorney, consultant, surety, indemnitor, insurer,
> or agent). But, subject to Rule 26(b)(4), those materials may
> be discovered if:
>
> (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the
> materials to prepare its case and cannot, without undue
> hardship, obtain their substantial equivalent by other means.

Fed.R.Civ.P. 26(b)(3).  In general, under Rule 26(b)(3), a party may not obtain

discovery of documents prepared by counsel in anticipation of litigation or for trial

without showing a "substantial need" for these documents. *See Hickman v. Taylor,* 329

U.S. at 511*.* "The doctrine is designed to protect material prepared by an attorney acting

for his client in anticipation of litigation.... Federal Rule of Civil Procedure 26(b)(3)

makes clear, however, the necessity that the materials be prepared in anticipation of

litigation, and not 'in the ordinary course of business, or pursuant to public requirements

unrelated to litigation.' " *United States v. Rockwell Int'l,* 897 F.2d 1255, 1265–66 (3d

Cir.1990) (quoting *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir.1982)

(citation omitted). The Third Circuit has explained that a document is prepared in

"anticipation of litigation" even when litigation is not imminent. The test is whether "in

light of the nature of the document and the factual situation in the particular case, the

document can fairly be said to have been prepared or obtained because of the prospect

of litigation." *United States v. Rockwell Intern.,* 897 F.2d at 1266.  An objective standard

is applied.  *See, e.g., Advanced Technology Associates, Inc. v. Herley Industries, Inc.,*

1996 WL 711018, at *6 (E.D.Pa. Dec. 5, 1996.) The party asserting work product

protection bears the burden of demonstrating that the documents at issue were

"prepared in anticipation of litigation."  *Conoco, Inc. v. United States*, 687 F.2d 724, 730

(3d Cir. 1982)

*Two-Part Test*

Courts in this Circuit have adopted a "two part test for ascertaining whether the

documents (or things) at issue should be protected under the work product doctrine."

*SmithKline Beechman Corp v. Apotex Corp.* 232 F.R.D. 467, 483 (E.D. Pa 2005)  "The

first prong of the inquiry is the 'reasonable anticipation' test, which requires that the

court determine at what point in time litigation could reasonably have been anticipated."

*In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 183 (D.N.J.2003) (citation omitted); *see

also Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir.1993).

Second, the Court must determine whether the documents were "produced because of

the prospect of litigation and for no other purpose." *Gabapentin, supra,* 214 F.R.D. at

184.  Documents prepared in the ordinary course of business, even if useful in

subsequent litigation, are not protected by the work product doctrine. *Id.* "Even where

the reasonable anticipation of litigation is established, whether the document comes

within the purview of the work product privilege still depends primarily on the reason or

purpose for the documents' production*." Id.* citing *In re Grand Jury Investigation*, 599

F.2d 1224, 1229 (3d Cir.1979).

From a review of the allegations in the First Amended Complaint, the Court can

divine when it was that the Debtor/Plaintiff could have reasonably anticipated that the

parties' dispute would go to litigation.  To recapitulate, the Plaintiff was formed in

November 2007.  In March 2008 it entered into the MSA with the Defendants to manage

the inpatient psychiatric facility.  The Defendants were to handle billings and collections

for the Plaintiff.  In April 2008, Plaintiff commenced operations at those facilities.  By

September 2008, a "seamless" switchover from the Defendants to Plaintiff was to have

occurred.  The transition, it is alleged, was anything but: payments which Plaintiff should

have received from Defendants in 2008 were not received until 2009.  By February

2009 the MSA had terminated and the Debtor was forced to obtain loans and to

contribute capital to meet current expenses.  The Debtor maintains that the Defendants

have failed to remit monies it collected since February 2009 for services rendered by

the Debtor prior that date.  *See* Defendants' Brief, Ex. A, First Amended Complaint, ¶¶

24, 29-30, 34-39, 50-58, 60, 63-64.  Accordingly, the Court finds that as of February

2009 the Plaintiff would have reasonably expected that its dispute with the Defendants

would be litigated.

The Court turns now to the question of which of the withheld documents were prepared primarily for the purposes of litigation.   All of the 220 documents withheld as work product post-date February 2009.  *See* Defendants' Supp Brief, Ex. "A," Privilege Log March 31, 2013. They span roughly from March 2010 to September 2010.  Yet, of the 220 documents withheld as "work product," the only entries specifically referencing litigation are ## 107 – 109 (8/25/2010) and # 319 (July 29, 2010).  The other 216 entries which are claimed to be work product are described generically as bankruptcy strategy. In its Supplemental Response, Plaintiff argues that such information is irrelevant because it pertains to the main bankruptcy proceeding, and not the litigation. *See* Plaintiff Supp. Response, 8.  If that is so, then it has no place on a privilege log; relevance is not an established ground for asserting privilege.

*Substantial Need*

But as to the four log entries which do appear to be related to the litigation, they are not required to be produced unless there is a showing of substantial need.  *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir.2003) (citing Fed.R.Civ.P. 26(b)(3) (explaining that notwithstanding the establishment of the privilege, a party seeking disclosure of documents claimed as work product must demonstrate substantial need for the materials in the preparation of his case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means.) So before demanding that the Plaintiff produce the 4 entries logged as relating to the litigation, Defendants must undertake other means of discovery in an attempt to obtain the same information.  If that fails and Defendants continue to maintain that the withheld

21

information is both highly relevant and the sole source of such evidence, then they may

move to compel its production.  In that event, the Court will conduct an *in camera* review

to determine if the withheld information warrants protection.

*Relevance*

As noted above, the Plaintiff's refusal to respond to certain discovery was not

limited to privilege, but rested on relevance grounds as well.  Indeed, the polestar of

discovery is relevance which the applicable rule defines broadly to include "information

[which] need not be admissible at the trial if the discovery appears reasonably

calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).  The

presumption that such matter is discoverable, however, is defeasible." *Pearson v.

Miller*, 211 F.3d 57, 65 (3d Cir.2000).  "Once an objection is raised as to relevancy, the

party seeking discovery bears the burden of demonstrating the relevance of the sought

information to the issues in litigation. *Lesemann v. GNC, Inc.*, 2003 WL 22872035, at *1

(E.D.Pa. Oct. 9, 2003).  When there is no doubt about relevance, however, a court

should tend toward permitting discovery. *Stabilus v. Haynsworth, Baldwin, Johnson &

Greaves, P.A.*, 144 F.R.D. 258, 265 (E.D.Pa.1992).

In arguing for, and against, relevance of the requested documents, the Court

sees that the parties disagree as to what documents, exactly, Defendants are

requesting.  The Defendants summarize the requested information as demanding

"documents pertaining to the Debtor's decision to file the bankruptcy, the decision to

liquidate, and calculations of the damages alleged." *See* Defendants' Brief, 4.  Plaintiff

is under the misapprehension that Defendants seek different information from it.

22

Specifically, Plaintiff believes that Defendants ask for document and communications about the bankruptcy, about the value of the Debtor today were it still operating, and about the details of any bids on the Debtor.  Most surprisingly, Plaintiff believes that the Defendants have requested from it "hundreds of pages of non-relevant bankruptcy documents including court filing, communications regarding bankruptcy strategy, schedules, claims analyses, preparation for bankruptcy court appearances, communications regarding the creditors committee,  trustee reports, as well as analysis of this adversary proceeding."  *See* Plaintiff's Response, 7-8;  Plaintiff's Supp. Response, 8-9.

The Court finds that the Plaintiff has misread the motion.  The motion seeks the enforcement of these six document requests and nothing more:

> 21. All documents reviewed by BBH when making its determination to file the Chapter 11 Petition.
>
> 22. All communications relating to BBH's decision to file the Chapter 11 Petition.
>  …
> 28.  All documents and correspondence indicating action BBH took, or intended to take, to expand its services to include a separate in patient adolescent behavioral health unit, as set forth in paragraph 82 of the Amended Complaint.
>
> 29. All documents and correspondence indicating actions BBH took, or intended to take, to build the expanded Inpatient Facility adjacent to St. Joseph's suburban Berks County campus, as set forth in paragraph 83 of the Amended Complaint, including, but not limited to, the "expansion plans."
> …
>
> 33. All documents BBH relied on when calculating its alleged loss of $5 million that BBH purportedly suffered as a consequence of its alleged inability to operate an inpatient

adolescent behavioral health unit as set forth in paragraph
82 of the Amended Complaint, including, without limitation,
all profit projections and all documents relied on in creating
those projections.

34. All documents BBH relied on when calculating its alleged
loss of $20 million that BBH purportedly suffered as a
consequence of its alleged inability to build an expanded
Inpatient Facility as set forth in paragraph 83 of the
Amended Complaint, including, without limitation, all profit
projections and all documents relied on in creating those
projections.

*See* Exhibit D, ¶¶ 21-22; 28-29 Ex.E, ¶ 33-34.  This is confirmed by the Motion and

Proposed Form of Order: documents are sought from the Plaintiff as demanded in the 6

requests set forth *supra*.  None of the six requests asks for documentation related to

bankruptcy case administration.  The Court now turns to the six requests to analyze

them for relevance.

*Request ## 21 and 22*

Again, these requests demand:

21. All documents reviewed by BBH when making its
determination to file the Chapter 11 Petition.

22. All communications relating to BBH's decision to file the
Chapter 11 Petition.

*See* Defendants' Brief, Ex. D. Second Request for Production.  The Court considers

Plaintiff's claim of irrelevance of little persuasion.  On the surface, one might question

what the decision to file bankruptcy might have to do with this litigation.  As the

Defendants point out, however, the bankruptcy filing is the alleged ultimate result of the

Defendants' derelictions under the MSA.  *See* Defendants' Brief, 14.  The failure of the

Defendants to bill and collect revenue for Plaintiff as promised is the alleged

precipitating factor that caused the company's demise and ensuing bankruptcy.  The

extent of the Defendants' misfeasance may be reflected in the documents which the

company's principals reviewed when they decided upon Chapter 11.  Similarly, they

may have discussed the extent to which the blame for the company's demise may be

laid at the feet of the Defendants.  The Defendants have thereby demonstrated to the

Court that such information is at least reasonably likely to lead to admissible evidence.

That, in turn, makes it discoverable.

*Requests ## 28 and 29*

These requests demand production of

> 28.  All documents and correspondence indicating action
> BBH took, or intended to take, to expand its services to
> include a separate inpatient adolescent behavioral health
> unit, as set forth in paragraph 82 of the Amended Complaint.

> 29. All documents and correspondence indicating actions
> BBH took, or intended to take, to build the expanded
> Inpatient Facility adjacent to St. Joseph's suburban Berks
> County campus, as set forth in paragraph 83 of the
> Amended Complaint, including, but not limited to, the
> "expansion plans."

*Id.*  The challenge to the relevance of these two requests is weak.  The claim that the

Debtor would have expanded the business with Defendants' promise of assistance is

one of the reasons that Plaintiff entered into the MSA in the first place.  The Defendants'

failure to properly bill and collect for services rendered, if true, not only cost Plaintiff

potentially $2 million in direct losses but also made it impossible to expand the

business.  *See* Defendants' Brief, Ex. A, First Amended Complaint, ¶ 64.  The inability

to expand is alleged to have cost the Plaintiff $25 million in consequential damages.

Defendants question the premise underlying the consequential damages claim and

therefore ask for the production of documents on this point.  Defendants' Brief, 10.  The

Court finds that Requests ## 28 and 29 ask for relevant information.

*Relevance and Damages*

Requests ## 33 and 34 ask for documents relied on by Plaintiff in when

calculating its consequential damage claims:

> 33. All documents BBH relied on when calculating its alleged
> loss of $5 million that BBH purportedly suffered as a
> consequence of its alleged inability to operate an inpatient
> adolescent behavioral health unit as set forth in paragraph
> 82 of the Amended Complaint, including, without limitation,
> all profit projections and all documents relied on in creating
> those projections.

> 34. All documents BBH relied on when calculating its alleged
> loss of $20 million that BBH purportedly suffered as a
> consequence of its alleged inability to build an expanded
> Inpatient Facility as set forth in paragraph 83 of the
> Amended Complaint, including, without limitation, all profit
> projections and all documents relied on in creating those
> projections.

*See id.*, Ex. E.  Plaintiff has refused to respond to these requests at this time arguing

that it is premature.  Such information, it explains, bears not on liability, but rather on

damages.  It assures Defendants, however, that the damages calculation will be

furnished by its expert witness as required under the scheduling order.  As that order

does not require identification of that witness until February 2014 and its delivery of the

expert report until March 2014, it will not be produced at this time.  *See* Twelfth Pretrial

Scheduling Order, ¶ 4.

The Court finds that explanation to be wholly unsatisfactory.  "The law is well

settled that information regarding damages is as discoverable as information which

pertains to liability." *Caruso v. Coleman Co.*, 157 F.R.D. 344, 348 (E.D.Pa.1994) citing

*Security Ins. Co. v. Meyer Trading Co.,* 1987 WL 8207, at *1(E.D.Pa. March 20, 1987).

A leading commentator explains that "[a]s a general matter, it is clear that discovery as

to damages is proper." 8 *Fed.Prac.& Proc. Civ.* § 2008.04 (3d ed.)  While in many cases

trials of liability and damages are bifurcated, this is done where the issue of damages is

truly separate from liability.  *Id.*  In this case, the Plaintiff has offered no evidence that

the two elements of Plaintiff's case are so distinct as to be triable in phases.  To the

contrary, the Defendants correctly read the Complaint to allege that the direct damages

($2 million) and the consequential damages ($25 million) are both the alleged result of

the Defendants' breaches under the MSA.  See Defendants' Brief, 3.  There do not

appear to be any efficiencies to be had from bifurcation.  Plaintiff's withholding of the

requested information is not sanctioned by the general rule requiring the production of

relevant evidence.  The Court finds these requests to ask for relevant information.

Accordingly, the Plaintiff must respond to these requests.

*Overbreadth*

          Plaintiff's final challenge to the requests is that they are overbroad.  The Advisory

Committee Note to Rule 26 contemplates that when a party objects to discovery

requests as being impermissibly overbroad, "the court would become involved to

determine whether the discovery is relevant to the claims or defenses and, if not,

whether good cause exists for authorizing it so long as it is relevant to the subject

matter of the action." Fed.R.Civ.P. 26 Advisory Committee Note (2000), subdivision

(b)(1).  A leading commentator explains that "when relevance has been demonstrated courts will scrutinize claims that the burden of producing requested information is disproportionate; and an unsupported burden objection is not a guaranteed protection against responding to discovery."  8 Fed. Prac. & Proc. Civ. § 2008.1(3d ed.)

As with the relevance objection, the Plaintiffs maintain that Defendants' request for all documents and communication relating to the bankruptcy includes hundreds of pages of irrelevant documents.  The documents consist, by and large of, bankruptcy case administration documents, as opposed to anything related to this litigation.  *See* Plaintiff's Response, 8.  Additionally it has produced a privilege log of over 700 entries which likewise consist of material pertaining to the main proceeding and not this litigation.  *See* Plaintiff's Supplemental Response, 2 and 8.  This, Plaintiff maintains, constitutes a discovery request of exaggerated scope.

But, again, general bankruptcy case administration documents were not requested.  Indeed, one would be on safe ground to say that what was requested pertains primarily to prepetition matters.  The first two requests (##21 and 22) deal with the decision making process behind deciding to file the bankruptcy case, something which had to occur prepetition; the second two requests (## 28 and 29) address the purported intention to expand the clinic, one of the operative premises of the Plaintiff's claim; and the last two requests (## 31 and 32) ask for information supporting the damages calculations, which pertains solely to the litigation.  These appear to the Court to be fairly circumscribed requests as to patently relevant information.  The Court is at a loss to see at what great burden Plaintiff is put to produce responsive documents.

Accordingly, the Court does not find the requests to be unreasonable in scope.

*Summary*

   With the exception of the four privilege log entries found to constitute work

product, the Plaintiff must respond to all six requests for production discussed above.

   An appropriate Order follows.

By the Court:

_____

Stephen Raslavich<br>United States Bankruptcy Judge

Dated:  October 21, 2013